# Exhibit 65

# Withholding of dividend tax relating to dividends to foreign parent company

Subsequent instance: (SKM2012.121.ØLR) Judgment of the Eastern High Court of 20 December 2011, 14th Chamber, B-2152-10

| | |
|---|---|
| Date of release | 16 Apr 2010 11:34 |
| Date of judgment / ruling / decision / control signal | 03 Mar 2010 09:47 |
| SKM number | SKM2010.268.LSR |
| Authority | The National Tax Court |
| Case number | 09-01478 |
| Document type | Order |
| Overall topics | treasure |
| Topics Topics | Corporate taxation |
| Keywords | Dividend, dividend tax, parent company, double taxation, rightful owner |
| Summary | One company was not deemed to be liable to withholding tax on dividends paid to the parent company in Luxembourg. |
| Reference (s) | The Corporation Tax Act § 2, para. 1, letter c<br>The Withholding Tax Act § 65, para. 5 |
| Reference | - |

The complaint is due to the fact that SA / S is considered liable to withhold dividend tax on dividends paid to the parent company in Luxembourg, cf. the withholding tax act, section 65. 1 and 5, cf. the Corporation Tax Act, section 2, subsection 1, letter c, as the parent company is not considered the rightful owner of the dividend.

**The decision of the National Tax Court**

The National Tax Court changes SKAT's decision, as SA / S is not considered liable to withhold tax on the dividend in question.

**Summary of case information**

A number of private equity funds bought AA / S through a holding company, H Sarl in Luxembourg. The immediate investors in the various private equity funds constitute according to the representative institutional investors, including pension funds, banks, mutual funds and companies, other private equity funds ("fund of funds"), a number of companies and private individuals.

One company owned by the private equity funds, DA / S, offered the existing shareholders in AA / S to buy the company at a price of K. DA / S was to function as a holding company for AA / S. DA / S had not had any activity since its inception.

DA / S signed the agreements on credit facilities that were necessary for the purchase of AA / S. There were three loan agreements. According to all three loan agreements, it was a condition that the investors deposited x DKK, and the amount had to be paid in the day before accepting the purchase of AA / S.

The day after the expiry of the offer - which was accepted by more than 90% of the shareholders - SA / S was established by the private equity funds. In connection with the foundation, DA / S was contributed in kind, so that DA / S became a wholly owned subsidiary of SA / S.

A few days later, the share capital in SA ∕ S was increased by a cash deposit of x DKK. The new shares were subscribed for by the existing shareholders, ie. private equity funds.

On the same day, the private equity funds deposited all their shares in SA ∕ S in H Sarl against consideration in shares in H Sarl.

The sole activity of H Sarl and the other holding companies is to own and finance their subsidiary.

The following day, an annual report was submitted for SA ∕ S 'first financial year for the period from the foundation. On the same day, the annual general meeting of SA ∕ S was held, where it was decided to pay a dividend of y DKK to the parent company, H1 Sarl

On the same day, H1 Sarl granted two loans to SA ∕ S - a convertible loan and a non-convertible loan - in total approximately equal to the entire declared dividend.

Account statements have been submitted from H1 Sarl's bank account, from which the transfers appear.

Also on this day, SA ∕ S made an increase in the share capital in DA ∕ S by cash payment of x DKK.

At the end of the same year, the convertible loan with accrued interest was converted into shares in SA ∕ S.

It is stated about the Luxembourg companies that they have a registered address in Luxembourg, that they do not have employees, that they are managed by a Board of Managers who are identical in the two companies, and that the day-to-day administration etc. is handled by one of the private equity funds. management companies.

The management company's tasks include in the storage and maintenance of statutory shareholder registers, minutes of the Board of Directors and general meetings, invoicing, bookkeeping, preparation of accounts, holding of meetings and general meetings, contact with authorities, etc.

H Sarl and H1 Sarl have i.a. expensed "staff costs", which amounts form part of the companies' payment to the management company in question. The companies hold approx. three board meetings and one general meeting per year.

**SKAT Center for Large Companies decision**

The company should have included dividend tax on dividends to the parent company.

It follows from the Corporation Tax Act § 2, paragraph. 1, letter c, that dividends from Danish companies paid to foreign companies are subject to limited tax liability in this country unless such taxation is to be waived in accordance with the EU Parent ∕ Subsidiary Directive, Directive 90/435 EEC or a double taxation agreement. Neither the directive nor the Danish ∕ Luxembourg DBO, Executive Order no. 95 of 23 September 1982 of the double taxation agreement of 17 November 1980, precludes Denmark from taxing the dividend amount, as H1 Sarl, Luxembourg, cannot be considered a "beneficial owner" of the dividend amount.

The Danish ∕ Luxembourg DBO, Executive Order no. 95 of 23 September 1982 of the double taxation agreement of 17 November 1980

The above-mentioned DBO between Denmark and Luxembourg must be interpreted in the light of the comments on the OECD's model agreement. In the comments on the model agreement, the question of the understanding of the term "beneficial owner" is translated into: "rightful owner" is now dealt with in particular in points 12, 12.1 and 12.2, to Article 10, in which it is stated (with SKAT's emphasis):

"The right of ownership requirement was inserted in Article 10 (2) in order to clarify the meaning of the words" paid to a resident in paragraph 1 of the Article. It is hereby clarified that the **source State is not obliged** to waive its taxing right to dividend income simply because the income was paid directly to a resident of a State with which the source State has entered into an

agreement.The **term beneficial owner is not used in a narrow technical sense, but must be seen in the context and in the light of the intent and purpose of the agreement, including avoiding double taxation and preventing tax evasion and avoidance.**

12.1 When an income is paid to a resident of a Contracting State acting in his capacity as agent or intermediary, it shall not be in accordance with the intent and purpose of the agreement for the source State to grant relief or tax exemption solely on the basis of: the status of the immediate income recipient as a resident of the other Contracting State. In this situation, the immediate income recipient is a person resident in the other State, but no double taxation arises as a result, since the income recipient

person resident in the other State, but no double taxation arises as a result, since the income recipient is not considered to be the owner of the income for tax purposes in the State in which he is resident. It would as well **not be consistent with the intent and purpose of the agreement if the source State were to grant relief or exemption from tax** in cases where a resident of a Contracting State other than as an agent or intermediary **merely acts as a "flow-through entity; "(conduit) for another person who actually receives that income.** For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "flow-through company" cannot normally be considered the rightful owner if it, although the formal owner, actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

12.2 Subject to the other conditions of the article, the limitation on the taxing right of the source State shall continue to exist when an agent or intermediary, resident in a Contracting State or in a third State, is deposited between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State. state. (The model text was amended in 1995 to clarify this point, which is in line with the views of all Member States). States wishing to express this more clearly are free to do so during bilateral negotiations. "

The comments state that the DBO does not in itself cut off / limit source state taxation of dividends unless the rightful owner of the dividends is a resident of the other Contracting State. Decisive for determining "the rightful owner" is, according to the comments, whether the formal interest recipient merely acts as a "conduit" for another person who actually receives the income in question.

The comments on the Model Convention must be understood as meaning that it is not in itself decisive that the dividend amounts have not been immediately passed on to the underlying owners, as the decisive factor is the formal beneficiary's lack of power to dispose of the amounts paid, as the underlying owners completely determines how to deal with amounts received. This interpretation is also confirmed by the report of the Committee on Fiscal Affairs mentioned in the comments.

It is not the view that holding company structures should never be respected so that a dividend or interest-receiving holding company cannot rely on a DBO entered into with the source country for the purpose of exempting or limiting source country taxation.

However, a DBO does not cut off source country taxation when the underlying owners - who are not themselves resident in a country with which a DBO has been entered into - have disposed of the amounts in advance or automatically, or it must otherwise be assumed that the holding company has not any practical option to dispose of otherwise than determined by the owners.

As an example of a country refusing to use a DBO based on the OECD's model agreement, reference can be made to a decision of the Swiss Supreme Court which is mentioned and referenced in the answer to question 7 to the Folketing's tax committee of 21 November 2006 regarding L 30. In the case a Swiss company was denied collective bargaining benefits, as the court found it decisive that the Danish company was allegedly a mailbox company and had no business reasons - apart from the tax ones - to be established in Denmark. The Danish holding company was not considered the rightful owner of the income.

In summary, H1 Sarl is not considered a beneficial owner as the company has no activities and as the company has no independent right to dispose of the dividend amounts. As H1 Sarl is only deposited as an intermediate holding company, which in fact has no authority to dispose of these amounts in any other way than the underlying ownership structure has decided in advance, the Danish / Luxembourg DBO is not considered to prevent Denmark from implementing a source country taxation of the dividend amounts. On the contrary, there is no commercial purpose for the contribution of the intermediate holding company, which is therefore seen as having no other purpose than to seek to avoid Danish withholding tax (or obtain other tax benefits).

<u>EU law</u>

The case law of the European Court of Justice is that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from e.g. Parent-Subsidiary Directive - when it is assumed that the establishment of a holding company in another Member State "aims to avoid withholding tax on payments to non-European companies if such a construction serves no commercial purpose", cf. -Commission interpretation of "Purely artificial arrangements" published in OJ 2008 C 116/13.

This interpretation is supported by the case law of the European Court of Justice, cf. Cadbury Schweppes, Case C-196/04 Cadbury Schweppes [2006] ECR 1-7995;

EU law can therefore not to a greater extent than the DBOs based on the Model Agreement be considered to prevent Denmark from implementing a source state taxation of interest and dividends when

the rightful owners of the amounts in question are persons domiciled outside the EU.

In summary, it is the view that H1 Sarl is not a beneficial owner, as the company has no activities and as the company has no independent right to dispose of the dividend amounts. As H1 Sarl, Luxembourg is only deposited as an intermediate holding company, which does not really have the power to dispose of these amounts in any other way than the underlying ownership structure has decided in advance, EU law - including EU directives - is not considered to cut off Denmark from implementing a withholding tax. On the contrary, there is no commercial purpose for the contribution of the intermediate holding company, which is therefore seen as having no other purpose than to seek to avoid Danish withholding tax (or obtain other tax benefits).

<u>Lack of independent disposal right in H1 Sarl</u>

The distribution and simultaneous re-lending of almost the entire amount distributed is considered to constitute a cash flow determined in advance by the underlying owners, so that H1 Sarl in relation to these dispositions can be claimed to have been a pure "administrator" or a pure "tool". for the dispositions of the underlying owners.

The company's representative has stated that it was originally assumed that the investors' deposits of x DKK should have been deposited in the Luxembourg companies and then downstream via SA / S to DA / S. In this connection, it was planned that H1 Sarl would partly provide the funds in SA / S by issuing a subordinated convertible loan and an ordinary loan.

However, investors chose instead to inject capital directly into SA / S and only then establish the Luxembourg part of the group structure through successive share exchanges. The reason why the investors chose to deposit the cash amount directly in SA / Si instead of via the Luxembourg companies was, according to the representative, that a capital injection to the Luxembourg companies would have triggered a very significant and for the desired capital structure completely unnecessary capital duty in Luxembourg .

Therefore, in accordance with the information provided, it must be stated that it was decided in advance by the underlying owners (the "investors"), exactly how to deal with the amount distributed to H1 Sarl. There is also no indication , that at some point some decision has been taken by the Luxembourg company on the re-lending, even though all decisions taken at "board meetings" have allegedly been forwarded.

In addition, the original loan documents state in several places that this intra-group borrowing maneuver has been planned from the outset. Eg. no distinction is made between whether the private equity funds' own financing of at least x DKK is invested as share capital or as subordinated shareholder loans. This is stated in the Loan Document.

**The company's claim and arguments**

The company's representative has filed a claim that the company's withholding obligation regarding dividends to the parent company be abolished.

In support of the claim, it is generally argued that neither H1 Sarl nor the underlying owners (the ultimate investors in the private equity funds) are subject to limited tax liability in Denmark of the dividend in question to H1 Sarl, cf. 1 (c) in conjunction with Article 10 of the Double Taxation Agreement between Denmark and Luxembourg and the Parent-Subsidiary Directive (90/435 / EEC).

It is hereby claimed that H1 Sarl is the beneficial owner of the dividend received within the meaning of the double taxation agreement.

It is further argued that H1 Sarl has an unconditional right to tax exemption for the dividends pursuant to the Parent-Subsidiary Directive.

In the alternative, it is argued that SKAT's decision is an expression of a tightening of a fixed administrative practice with retroactive effect, and that such can not legally be implemented without appropriate notice.

<u>The Corporation Tax Act 2, sec. 1, letter c</u>

The rules on foreign companies' limited tax liability on dividends distributed from Danish companies are set out in section 2 (1) of the Danish Corporation Tax Act. 1, letter c.

The limited tax liability does not include dividends received by a parent company that owns at least 20% of the share capital of a subsidiary for a continuous period of at least 1 year, within which period the dividend distribution date must be. These conditions, which correspond to the conditions that must be met in order for a Danish parent company to receive tax-free dividends, are met in the present case.

In addition, it is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of the Parent / Subsidiary Directive or in a double taxation agreement. Thus, if only the taxation of dividends is to be relaxed under one of these regulations, there is no limited tax liability.

<u>The double taxation agreement between Denmark and Luxembourg</u>

The Danish-Luxembourg double taxation agreement of 17 November 1980 contains in Article 10 the following provision on the distribution of the right to tax dividends:

"(1) Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

(2) However, such dividends may also be taxed in the Contracting State in which the company paying the dividends is domiciled and in accordance with the law of that State, but the tax imposed may not, if the recipient is the <u>beneficial owner</u> of the dividends , exceed:

a) 5 pct. of the gross amount of the dividend if the rightful owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 per cent. of the capital of the company paying the dividend;

b) 15 pct. that the gross amount to the dividend in all other cases. "(emphasis added).

The provision corresponds to Article 10 of the 1977 OECD Model Convention.

The term "beneficial owner" is neither defined in the Danish-Luxembourg double taxation agreement nor in the model agreement. The OECD's comments on the 1977 Model Convention, paragraph 12, state the concept:

"Under paragraph 2, the limitation of taxation in the source State shall not apply in cases where an intermediary, such as an <u>agent</u> or a <u>specially designated person</u> , is deposited between the payee and the payer, unless the beneficial owner is a resident of the other Contracting State. "Whoever wants to make this clearer is free to do so during bilateral negotiations." (Emphasis made by the representative).

Since the H1 Sarl is neither the "agent" nor the "nominee" of the ultimate owners, it is clear from the 1977 comments that the H1 Sarl is the "rightful owner".

While Article 10 of the current Model Agreement essentially corresponds to the provision in the 1977 version, the comments on the concept of beneficial owner have expanded significantly over the years. Point 12 of the comments relied on by SKAT was given its current content in the 2003 audit.

In Danish tax law practice, it is assumed that the OECD's comments on the model agreement can be included in the interpretation of specific double taxation agreements. The starting point is that the interpretation must be based on the version of the model agreement with comments that was in force at the time of the conclusion of the specific agreement. If new comments are an expression of a change compared to previous versions - and not just a clarification - the new comments to the model agreement can not be used as a basis.

It is therefore an independent question whether the extended comments from 2003 are an expression of a change or a clarification. However, as the new comments do not support SKAT's view in the present case, the question is not pursued further here.

<u>"Flow companies"</u>

Point 12 of the comments relied on by SKAT was expanded in the revision in 2003. New in relation to previous versions of the comments is the remark that the term "rightful owner" is not used in a narrow technical sense, but must be seen in connection with and in in the light of the intent and purpose of the agreement, including avoiding double taxation and preventing tax evasion and avoidance.

This is further elaborated in point 12.1 in that, firstly, it would not be in accordance with the intention and purpose of the agreement if the source country were to provide relief by payment to an agent or intermediary ("agent or nominee"), as he is not the owner of income and thus not taxed in its country

of domicile, which is why there is no double taxation. This corresponds to the commentary on the 1977 model agreement.

Secondly, it is stated about "conduit companies":

"It would also not be in accordance with the intention and purpose of the agreement for the source State to grant relief or exemption from tax in cases where a person resident in a Contracting State, other than as an agent or intermediary, merely acts as a <u>"conduit" for another person who actually receives that income.</u>For these reasons, the report "Double Taxation Conventions and the Use of

Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "flow-through company" cannot normally be considered the rightful owner if it, although the formal owner, actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties. "(emphasis added).

In the present case, H1 Sarl has not redistributed the dividends received to the underlying owners. On the contrary, the H1 Sarl has retained this dividend. The company has used the distributed amount for a loan to SA / S and even later converted the receivable into share capital. The amount that H1 Sarl received in dividends was thus reinvested in SA / S and continues to form part of the equity in H1 Sarl In fact, at no time since the purchase of AA / S has dividends been distributed to the underlying owners. H1 Sarl has thus not functioned as a flow unit (conduit).

It is clear from the comments that it is a necessary element of the flow-through consideration that there is "another person who actually receives the income in question" ("another person who in fact receives the benefit of the income concerned").

The fact that the dividend is required to be further channeled to the underlying owners is also presumably stated in paragraph 22 of the comments, which specifically mentions the situation where an intermediate foreign holding company, according to its practice, fails to pay its profits in the form of dividends to the underlying owners, (and the company otherwise enjoys a favorable tax treatment in the country concerned). The comments recommend bilateral agreement on special exemptions from Article 10 in this situation, which clearly shows that the intermediate holding company is presumed to be the beneficial owner.

The report from Committee on Fiscal Affairs section IA 2 states:

"This report deals with the most important situation of this kind, where AA / S company situated in AA / S treaty country is acting <u>as a conduit for channelling income</u> economically accruing to AA / S person in another State who is thereby able to take advantage "improperly" of the benefits provided by a tax treaty. " (Underline of the Representative).

As stated in the term "conduit for channeling income", it is a prerequisite that the amount is passed on to the person who is claimed to be the beneficial owner of the income. Thus, when the report in the following mentions a conduit company, it is assumed that this forwards the amount to the beneficial owner. This also applies to the following statement in the report, to which point 12.1 of the comments, as reproduced above, refers directly:

"The provisions would, however, apply also to other cases where a person enters into contracts or takes over bonds under which he has a similar function to those of a nominee or an agent. Thus a <u>conduit company</u> can normally not be regarded as the beneficial owner if, though the formal owner of certain assets, it has very narrow powers which render it a mere fiduciary or an administrator acting on account of the interested parties (most likely the shareholders of the conduit company). In practice, however, it will usually be difficult for the country of source to show that the conduit company is not the beneficial owner.<u>The fact that its main function is to hold assets or rights is not itself sufficient to categorize it as a mere intermediary, although this may indicate that further examination is necessary. </u>"(Emphasis added).

Thus, neither in the comments nor in the report of the Committee on Fiscal Affairs is there any basis for assuming that it is not decisive whether the dividend amounts have been passed on to the underlying owners. The point is, after all, that the dividends must have benefited the beneficial owner.

The Ministry of Taxation is of the same opinion. In this connection, reference is made to <u>SKM2008.728.DEP</u> (The Ministry of Taxation's comments on a request from FSR), where the Ministry has answered the following on p. :

"The Ministry of Taxation finds it difficult to see how in the above-mentioned example it can be demonstrated that the Cayman Island company is a flow-through company, as - in contrast to the example mentioned in Annex 26 to L 213 - <u>no cash flow is actually carried through Cayman Iceland Company. </u>"(Emphasis added).


SKAT's view that it is not in itself decisive that the dividend amounts have not been immediately passed on to the underlying owners is thus incorrect. For this reason alone, H1 Sarl must be regarded as the rightful owner of the amount distributed.

<u>Availability of the dividend</u>

SKAT's main reason for not considering H1 Sarl to be the rightful owner of the dividend in question is that the company - in SKAT's view - has lacked the power to dispose of the dividend itself.

The first comment on this is that it is quite true that the comments on the model agreement in section

The first comment on this is that it is quite true that the comments on the model agreement in section 12.1 have adopted the Committee on Fiscal Affairs' conclusion, according to which:

"a" flow-through company "can not normally be considered the rightful owner if, although it is the for-mal owner, it <u>actually has very narrow powers, which, in relation to the income in question, makes it a" nullity "or administrator who acts now on behalf of other parties.</u> "(Representative's emphasis).

The scope of the right of disposal is thus one of the elements that can be included in the assessment of whether a flow-through company is the rightful owner of the income, but H1 Sarl is precisely not a flow-through company.

The point in the comments is thus that when the dividend-receiving company has further channeled the dividend received to the underlying owners, - in assessing whether the company is the rightful owner - emphasis can be placed on whether this is a result of the underlying owners having restricted the company's disposal of the dividend. The decision of the underlying owners that the dividend re-ceived should remain in the intermediate holding company does not make the underlying owners the rightful owners of the dividend.

SKAT has thus overlooked that the lack of right of disposal over the dividend must be related to the further channeling of the dividend to the underlying owners.

H1 Sarl, which owns all the shares in SA / S, has at a general meeting of SA / S decided on the distri-bution, and H1 Sarl has on the same day decided to lend an almost equivalent amount to SA / S. H1 Sarl has thus received the full benefit of the amount distributed, which to this day continues to be in-cluded in the company's equity. Conversely, the owners behind it have not enjoyed the distribution at all.

It also follows that H1 Sarl's potential creditors may seek satisfaction in the value that the distribution represents.

It can easily be assumed that neither the decision to vote for the distribution of a dividend nor to lend the amount to AA / S are spontaneous management decisions in H1 Sarl. All major decisions in any group - e.g. on acquisitions of companies, major distributions, establishment of financing structure, etc. - is taken in the first instance by the top management of the group. Thereafter, the decisions are implemented by the relevant corporate bodies of the respective companies. Neither the individual companies as such nor the individual management members are, as a starting point, obliged to im-plement the planned decisions, but refusal to do so can of course lead to the members in question being replaced in accordance with the rules of the Companies Act. It cannot be the case that what is a usual decision-making procedure in every group,

It is difficult - if not impossible - to point to an intermediate holding company that SKAT will be able to accept as the rightful owner of a dividend. Whether this dividend is to be used by the company itself - e.g. for the purchase of a company - or must be re-channeled to the underlying owners, SKAT's view thus leads to the holding company not being the rightful owner.

<u>Autonomous or internal interpretation - the principle of the right income recipient</u>

The term "beneficial owner" is taken over from the common law legal tradition (primarily the UK and USA), which operates with a distinction between economic and legal ownership, where beneficial owner relates to economic ownership.

In civil law countries (including Denmark) a similar distinction between economic and legal owner-ship is not used. In Danish tax law, the total property right is considered, as a general rule, to be lo-cated with the same person. In determining who is the owner in the tax sense, the starting point is an assessment of who in the civil law sense has the main emphasis on the usual ownership powers.

It has been debated in the literature - nationally and internationally - whether the term "beneficial owner" should be interpreted autonomously (internationally), ie. without the involvement of internal law, or whether the term - at least in case of doubt - must be interpreted in accordance with internal law, in accordance with Article 3 (1). 2, in the OECD's model agreement and the Danish-Luxembourg agreement.

If an interpretation is to be made in accordance with internal law, the interpretation of beneficial owner / rightful owner will be internal Danish tax law, which must be used as a basis. As these terms have not been used in internal Danish tax law, it must be assumed that the Danish courts will apply the court-created principle of the correct income recipient.

Jakob Bundgaard and Niels Winther-Sørensen conclude in the article "Rightful owner of international group financing" in SR-SKAT 2007.395 after a review of the Supreme Court's practice:

"On the basis of the aforementioned Danish case law on internal law interpretation of concepts from

double taxation agreements, it must probably be assumed that the Danish courts will be inclined to at least to some extent interpret the concept of beneficial owner in accordance with internal Danish tax law. in other words, that the Danish courts will be inclined to regard the company which, according to a Danish tax law assessment, is considered the <u>rightful recipient of income</u> , to also be a <u>beneficial owner.</u> "(The representative's underlining).

The same result appears in Aage Michelsen in International Tax Law, 3rd edition, 2003, p. 426:

Most Danish double taxation agreements contain provisions in Articles 10-12 on beneficial owner as a condition for the restrictions in the source country taxation of dividends, interest and royalties. As mentioned in the discussion of the corresponding provisions in the OECD agreement, such provisions hardly any significant function, as most intermediaries, by observing the necessary legal formalities, will be able to meet the requirement of being the rightful owner without difficulty. The provisions will only apply to actual pro forma cases. will be achievable through the application of general principles of law. "

The Minister of Taxation is of the same opinion, cf. the Minister of Taxation's answer of 6 November 2006 to question 5 474:

The principle of "correct income recipient" must thus be used to determine who "receives" the inter-est. The term "right income recipient" must be considered to be very similar to the term "beneficial owner", which is used in the double taxation agreements. , if the beneficial owner of the dividends is a resident of the other State. ""

The question then is what the principle of the correct income recipient in Danish tax law is about in relation to dividend income.

It is a clear starting point in Danish tax law that dividends are taxed on the taxable person who, in civil law terms, owns the shares in the dividend-distributing company. If the right recipient of the dividend is to be regarded as someone other than the owner of the shares, this in practice requires a very spe-cial justification.

In the present case, it can be readily established that H1 Sarl is the rightful recipient of the dividends distributed. The fact that the dividend has been used for a loan to SA / S immediately after the distri-bution does not change this. This would also apply if H1 Sarl had redistributed the amount to H Sarl, who had redistributed it to the underlying owners.

Thus, there are no special reasons why H1 Sarl, which is the sole owner of the shares in SA / S, should not be the rightful recipient of income under Danish law - and thus also the beneficial owner under the double taxation agreement - of the dividend in question.

<u>No abuse provision in the double taxation agreement</u>

Many countries have included in their respective double taxation agreements specific abuse provi-sions to counter the use of conduit companies.

Such abuse provisions do not exist in the Danish-Luxembourg double taxation agreement.

The comments on Article 1 of the Model Agreement contain in paragraphs 11-20 a number of pro-posals for such abusive provisions that the countries may, if desired, include in their agreements.

These draft misconduct provisions were already contained in the above-mentioned report of the Committee on Fiscal Affairs, "Double Taxation Conventions and the Use of Conduit Companies", dated 27 November 1986, and this report is indeed mentioned in paragraph 11 of the comments.

The different provisions use different methods, which are named respectively:

- "the look through approach"
- "the subject-to-tax approach"
- "the channel approach"
- "the exclusion approach".

The "look through approach" (transparency method) means that a dividend-receiving company must not be entitled to collective bargaining benefits if it is owned or controlled by persons who are not domiciled in the same state as the company.

The "subject-to-tax approach" means that collective benefits in the source state are only granted if the income in question is subject to taxation in the state of residence (subsidiary tax law).

"The channel approach" aims in particular to exclude "stepping-stone" events.

The "exclusion approach" is to exclude particular types of companies from the scope of the

The "exclusion approach" is to exclude particular types of companies from the scope of the agreement.

The fact that the comments contain proposals for abuse provisions aimed specifically at flow-through companies, and a number of countries have included such provisions in their agreements, must be based on the premise that a flow-through company in general will not be able to be denied agreement benefits on the grounds that it is not a beneficial owner.

Similar considerations are set out by Philip Baker in the "Progress Report of the Subcommittee on Improper Use of Tax Treaties: Beneficial Ownership", dated 17 October 2008. It is stated here in paragraph 14 on pages 9-10:

"I also take the view that the beneficial ownership concept is a narrow provision designed to counter only certain specific examples of treaty shopping: this is supported by the reference in the Commentaries to the OECD and UN Models to nominees and agents (and in the OECD Model to aconduit having very narrow powers which render it a mere fiduciary or administrator acting on account of another). I also take this view based upon the advice found in the Commentaries to the OECD and UN Models that Contracting States may include more specific anti- Finally, I base this view also on the practice of a number of States to include more elaborate and detailed anti-shopping provisions (for example, separate Limitation on Benefit Articles) :if the beneficial ownership concept was a broad, general anti-treaty-shopping measure, some of those more detailed provisions might be unnecessary. "(Emphasis added).

On the basis of the above, it is argued that the provision on beneficial owner cannot be used as a general abuse provision, and that denial of collective bargaining benefits on this ground can only take place in completely exceptional cases.

It has been mentioned above that such a case does not exist in the present case. As will be seen below, there is no treaty shopping in the present case.

Furthermore, it is noted that the reasoning used by SKAT for not considering H1 Sarl as beneficial owner actually works in the same way as a "look through" provision.

International case law

There are only a handful of foreign judgments that deal with the understanding of the concept of beneficial owner in the sense of the model agreement. In Dutch Supreme Court case law, there are two judgments from the Hoge Raad.

In the first judgment of 1994, a person resident in England received dividends from a Dutch company. The owner of the shares in the company was a company domiciled in Luxembourg. Although the recipient of the dividend was not the owner of the shares, the Hoge Raad considered him to be the beneficial owner. Crucial for the Hoge Raad was that the recipient of the dividend could dispose freely of dividend coupons and of the dividend paid. The judgment is an expression of the fact that the Hoge Raad to a large extent emphasized who was legally entitled to dividends.

In the second judgment of 2001, a stock trader bought an option the day before the distribution of dividends. The purchase of the option was justified in order to make a profit and was not made in order to avoid limited tax liability. Hoge Raad found that the stock trader had to be considered a beneficial owner.

In March 2006, the English Court of Appeal ruled in the so-called Indofood case. The subject-matter of the case was a civil dispute concerning whether Indofood, which had issued corporate bonds on the international market, could demand that the bonds be repurchased early. Under the agreed terms, this could happen if there were significant changes in Indonesian law, so that interest payments from Indonesia were subject to a withholding tax of more than 10%. However, this right to repurchase the bonds did not apply if the issuer could obviously avoid this effect by taking "reasonable measures". In order to avoid the Indonesian withholding tax of 20% on interest payments, the bonds had originally been issued by a wholly owned subsidiary in Mauritius, thereby reducing the Indonesian withholding tax on interest payments under the double taxation agreement between Indonesia and Mauritius to 10%. In 2005, the double taxation agreement between Indonesia and

Mauritius was repealed, and as a result, the Indonesian withholding tax on interest rates rose to 20%. The question then was whether the increased withholding tax on interest could be avoided by depositing a Dutch company (SPV), as the Indonesian withholding tax on interest could thereby be reduced with reference to the double taxation agreement between Indonesia and the Netherlands. Indofood argued that the Dutch SPV would not be considered a beneficial owner of the interest payments. The Court of Appeal followed Indofood's argument and found

Paragraph 44 of the judgment states:

"In practical terms it is impossible to conceive of any circumstances in which either the Issuer or Newco could derive any" direct benefit "from the interest payable by the Parent Guarantor except by funding its liability to the Principal Paying Agent or Issuer respectively. <u>Such an exception can hardly be described as the "full privilege" needed to qualify as the beneficial owner, rather the position of the Issuer and Newco equates to that of an "administrator of the income"</u> . " (Underline of the Representative).

The ruling is thus about a so-called "back-to-back" loan, where no income would be created in the Dutch SPV.

As is apparent, the facts of this case are far from the present case, where the dividend is to be distributed and where the dividend has remained in the recipient company.

On 20 December 2006, the French Conseil d'Etat ruled in the so-called Bank of Scotland case.

The case was about a very special situation where the civil law and the economic ownership for a dividend were divided. Thus, a US parent company had sold to the Bank of Scotland (a UK company) the right to receive pre-determined dividends for three years arising from voiceless preference shares in its French subsidiary. The payment to the US parent company from the bank corresponded to three years' net dividends (before withholding tax). The US parent company was also the sole owner of the ordinary shares in the French subsidiary under this so-called "ususfruct" agreement. The question in the case was whether the Bank of Scotland was entitled to a tax reduction and avoir fiscal under the French-English Double Taxation Convention, which depended on whether the Bank of Scotland was the beneficial owner of the dividends.

The judgment is thus almost an expression of the application of a consideration of reality.

As can be seen, the facts of this case are also miles away from the present case.

In its decision in the present case, SKAT referred to a single foreign judgment, namely a judgment of 28 November 2005 of the Schweizerische Bundesgericht.

SKAT has misunderstood the case. The case concerned the Danish-Swiss double taxation agreement from 1973, which, like the 1963 version of the OECD model agreement, does not contain a beneficial owner concept in Articles 10-12. The case is therefore not about the understanding of the term "beneficial owner" within the meaning of the agreement.

The Swiss tax authorities would not recognize that, according to the Danish-Swiss double taxation agreement, tax-free dividends could be distributed from a Swiss company to a Danish holding company. The Danish holding company was owned by a Guernsey company, which in turn was owned by a company in Bermuda. The Swiss Supreme Court ruled that there was a general abuse clause at the collective agreement level, regardless of the fact that the specific agreement did not contain a provision on beneficial owner or a special abuse clause. In this connection, the Court referred to the OECD's comments on the Model Agreement, in particular the transparency clause in paragraph 13 of Article 1, which is one of the abuse clauses that countries may choose to include in their bilateral agreements.

It is widely believed that the verdict goes too far. It is thus stated in Jakob Bundgaard and Niels Winther-Sørensen in SR-SKAT 2007.395:

"The Swiss judgment has in fact interpreted a 'look through' provision similar to the proposal in the OECD's comments on Article 1, paragraph 13 f. However, the OECD's comments on such a provision are merely a proposal for a wording that can be used, should the Contracting States wish to include such a provision, it is not "merely" a question of the Bundesgericht interpreting an older double taxation treaty in <u>the</u> light of recent OECD comments. <u>into the agreement itself, and the Bundesgericht has, in our view, gone too far in interpreting such a look-through provision in the Danish-Swiss double taxation agreement.</u> "(Underline of the Representative).

The Swiss judgment stands in stark contrast to the Canadian judgment in the Prévost case, which is discussed immediately below.

Furthermore, it should be noted that the facts of the Swiss case are far from the facts of the present case and that there was probably treaty shopping in this case.

The latest international ruling is the Canadian Court of Appeals' ruling in the Prévost case. The verdict was handed down on February 26, 2009. The case concerned a Canadian company (Prévost) that paid dividends to an intermediate holding company in the Netherlands (Prévost Holding). Prévost Holding subsequently redistributed the dividend to two companies in Sweden (Volvo) and England (Henlys), which owned 51% and 49% of the shares in the holding company, respectively. Volvo and Henlys had entered into a shareholder agreement, according to which 50% of the profit in Prévost

Henlys had entered into a shareholder agreement, according to which 30% of the profit in Prévost Holding was to be distributed to the shareholders, so the majority of the dividend would necessarily end up with Volvo and Henlys. Prévost Holding was a pure holding company and had neither employees nor offices in the Netherlands. The Federal Court of Appeal found - like the lower court, The Canadian Tax Court - that Prévost Holding was the beneficial owner of the dividend. The court hereby, among other things, emphasized that Prévost Holding was not a party to the shareholders 'agreement between Volvo and Henlys, and that neither Volvo nor Henlys could therefore take legal action against Prévost Holding if the company did not follow the dividend policy adopted in the shareholders' agreement. In paragraphs 13 and 14, the Court of First Instance endorsed the Court's understanding of the concept of beneficial owner, as expressed in paragraph 100 of the judgment under appeal, which reads as follows: if the company did not follow the dividend policy adopted in the shareholders' agreement. In paragraphs 13 and 14, the Court of First Instance endorsed the Court's understanding of the concept of beneficial owner, as expressed in paragraph 100 of the judgment under appeal, which reads as follows: if the company did not follow the dividend policy adopted in the shareholders' agreement. In paragraphs 13 and 14, the Court of First Instance endorsed the Court's understanding of the concept of beneficial owner, as expressed in paragraph 100 of the judgment under appeal, which reads as follows:

"100. In my view the" beneficial owner "of dividends is <u>the person who receives the dividends for his or her own use and enjoyment and assumes the risk and control of the dividend he or she received.</u> The person who is beneficial owner of the dividend is the person who enjoys and assumes all the attributes of ownership. In short the dividend is for the owner's own benefit and this person is not accountable to anyone for how he or she deals with the dividend income. (...) When corporate entities are concerned, <u>one does not pierce the corporate veil unless the corporation is a conduit for another person and has absolutely no discretion as to the use or application of funds put through it as conduit</u>, or has agreed to act on someone else's behalf pursuant to that person's instructions without any right to do other than what that person instructs it, for example, a stockbroker who is the registered owner of the shares it holds for clients. This is not the relationship between PH BV and its shareholders. "(Representative's underlining).

In paragraph 15, the court disposes of the tax authorities' consideration of transparency, according to which the decisive factor should be who can ultimately benefit from the dividend:

"15. Counsel for the Crown has invited the Court to determine that" beneficial owner "," bénéficiare effectiveif ", <u>" mean the person who can, in fact, ultimately benefit from the dividend ". That proposed definition does not appear anywhere in the OECD documents</u> and the very use of the word "can" opens up a myriad of possibilities which would jeopardize the relative degree of certainty and stability that a tax treaty seeks to achieve. The Crown, it seems to me, is asking the Court to adopt a pejorative view of holding companies which neither Canadian domestic law, the international community nor the Canadian government though the process of objection, have adopted. " (Emphasis made by the representative).

In paragraph 16, the Court then examines the facts of the case, which the lower court found to be decisive for Prévost Holding's beneficial owner of the dividend, and which the Court of Appeal agrees in its entirety:

"16. The Judge found that:

a) the relationship between Prévost Holding and its shareholders is not one of agency, or mandate nor one where the property is in the name of a nominee (par. 100);

b) the corporate veil should not be pierced because Prévost Holding is not "a conduit for another person", cannot be said to have "absolutely no discretion as to the use or application of funds put through it as a conduit" and has not " agreed to act on someone else's pursuant to that person's instructions without any right to do other than what that person instructs it, for example a stockbroker who is the registered owner of the shares it holds for clients "(par. 100);

c) there is no evidence that Prévost Holding was a conduit for Volvo and Henlys and there was no predetermined or automatic flow of funds to Volvo and Henlys (par. 102);

d) Prévost Holding was a statutory entity carrying on business operations and corporate activity in accordance with Dutch law under which is was constituted (par. 103);

e) Prévost Holding was not a party to the Shareholders Agreement (par. 103);

f) neither Henlys nor Volvo could take action against Prévost Holding for failure to follow the dividend policy described in the Shareholders' Agreement (par. 103);

g) Prévost Holding's Deed of Incorporation did not obligate it to pay any dividend to its shareholders (par. 104);

(par. 104);

h) when Prévost Holding decides to pay dividends, it must pay the dividends in accordance with Dutch law (par. 104);

i) Prévost Holding was the registered owner of Prévost shares, paid for the shares and owned the shares for itself; when dividends are received by Prévost Holding in respect of shares it owns, the dividends are the property of Prévost Holding and are available to its creditors, if any, until such time as the management board declares a dividend and the dividend is approved by the shareholders (par. 105). "

As is apparent, the facts highlighted by the court in support of Prévost Holding's beneficial owner are circumstances which characterize an ordinary holding company which has no other function than to be a holding company. The judgment thus rejects - in a situation where there has actually been a flow of dividends to the ultimate owners - that it should have any significance that the ultimate owners have decided in advance that dividends must be distributed through the companies, and that the holding company has no other activity and physical framework than those resulting from being a pure holding company.

The Canadian tax authorities have stated that the verdict will not be appealed to the Canadian Supreme Court.

The views expressed by SKAT in the present case have thus not been established in the Canadian courts.

In the present case, the dividend has not even been distributed to the owners behind it.

As can be seen, SKAT's decision in the present case goes far beyond any of the above-mentioned international judgments. SKAT has thus not considered H1 Sarl a beneficial owner, regardless of the fact that this company has retained the dividend received, and this continues to be included in the company's equity. It can thus be concluded that no support can be obtained in international case law for SKAT's interpretation of beneficial owner. On the contrary, international case law supports that H1 Sarl is the beneficial owner of the dividend received.

<u>Activity of the Luxembourg companies</u>

One of SKAT's two main reasons why H1 Sarl is not a beneficial owner is that the company has no activities.

The physical framework and the physical activity of any company will, of course, be adapted to the nature of the business which the company in question is to carry out. H1 Sarl, whose sole purpose is to own and finance SA / S, has exactly the activity that a pure holding company usually has. Such a company will have a limited activity. A general meeting and quite a few board meetings a year must be held to make the decisions that the holding company must make. There is therefore no need for an independent office or for permanent employees. The day-to-day administration is instead handled - cost-effectively - by a management company.

The activity in H1 Sarl - and H Sarl - thus corresponds completely to the activity in the hundreds of Danish and foreign - including Luxembourg - holding companies, which the Danish tax authorities have, according to established practice, considered to be rightful owners of dividends from subsidiaries.

Thus, there is not a single example that the Danish tax authorities have challenged that a Danish holding company should be the rightful owner of dividends from foreign subsidiaries, just as, as mentioned above, there are no other examples that the Danish tax authorities have challenged, that a foreign holding company is the rightful owner of dividends from Danish subsidiaries.

It is generally argued that it does not disqualify a company from being a beneficial owner, that it only operates as a holding company, and that it therefore has neither an independent office nor its own employees, cf. also the report from the Committee on Fiscal Affairs and the Minister of Taxation, cf. below. This conclusion has most recently been confirmed by the judgment in the Prévost case.

<u>Do not treaty shopping</u>

It is SKAT's opinion that there is an abuse of the Danish-Luxembourg double taxation agreement.

This is - for several reasons - not correct. First, it is not part of the private equity funds' business model that dividends must be distributed to the ultimate investors at some point. The model, on the other hand, means that investors only receive their return when the fund is wound up - and at that time as a capital gain (sale or liquidation), which is only taxed in the investors' respective countries of residence. The provisions on dividend taxation in the agreement have therefore not been decisive for the choice of domicile country for the holding companies. This is also confirmed by the fact that at no time since the private equity funds' acquisition of AA / S has a distribution arising from the group

time since the private equity funds' acquisition of AA / S has a distribution arising from the group been made to the private equity funds - and thus to the ultimate investors.

Second, the use of a Luxembourg intermediary holding company for the distribution of dividends does not generally entail special tax advantages. Thus, Luxembourg also has rules on dividend tax on dividends to tax havens, and Luxembourg's double taxation treaties are not much different from those of other EU countries.

Thirdly, it is very difficult - if not impossible - for private equity funds with hundreds of investors from many different countries to undertake treaty shopping.

It is thus a fact that there is no treaty shopping and that the provisions on dividend taxation in the Danish-Luxembourg double taxation agreement have not been decisive for the choice of Luxembourg.

The private equity funds are tax-transparent entities with hundreds of investors who are primarily domiciled in the Nordic countries, including Denmark, the EU and the United States. Of course, for practical reasons, so many investors have to make their investments through one or more holding companies. Investors have for a number of years made their investments through Luxembourg holding companies and have a good knowledge of the company law, regulatory and financial conditions in Luxembourg. In addition, Luxembourg is known for having a politically stable system and is a member of the EU. It is therefore only natural that Luxembourg should have been used as the seat of the top holding companies.

In addition, there is the advantage of Luxembourg that it is quick to get tax rulings, e.g. concerning interest rate spreads, and that it is possible - or as far as Denmark is concerned, so-called hybrid financing could be used, as has also been the case in the present case. It should be noted that, according to the case law of the European Court of Justice on freedom of establishment, it is a perfectly legitimate commercial justification for establishment in another EU country that the country in question has particularly favorable tax rules.

In any case, the capital funds' choice of domicile country for the holding companies has nothing to do with treaty shopping. Thus, the absolutely crucial precondition for dealing at all with the question of whether H1 Sarl is the beneficial owner of the dividend in question is not present.

<u>Parent / Subsidiary Directive</u>

The Parent / Subsidiary Directive, 90/435 / EEC, introduced a common tax system for parent companies and subsidiaries from different Member States. The purpose of the directive is i.a. to exempt withholding tax and other distributions of profits that subsidiaries pay to their parent companies.

Directive as amended by Council Directive 2003/123 / EC. Reference is made to Article 1 of the Directive on the scope, Article 3 on the definition of parent companies and subsidiaries and Article 5, which stipulates that withholding tax may not be levied on dividends.

It follows from those provisions that a Luxembourg holding company which satisfies the capital requirement of 20% and the ownership requirement of no more than two years which each Member State may have introduced has an unconditional right to be exempt from withholding tax on dividends from its subsidiary.

The ownership requirement in the Corporation Tax Act, section 2, subsection 1, letter c, is for one year, and the requirement is simply that the distribution must be within this period.

In contrast to the Interest / Royalties Directive (2003/49 / EC), the Parent / Subsidiary Directive does not require the parent company to be the beneficial owner of the dividends received. On the other hand, it is explicitly stated in Article 1 (1). 2, that the Directive does not preclude the application of national provisions or conventions which are necessary to prevent fraud and abuse. Thus, rules can be introduced in national law to combat abuse, but these rules must in themselves be compatible with EU law, including the treaty-guaranteed freedoms, as laid down in the case law of the European Court of Justice.

As a standard of Community law, it is for the European Court of Justice alone to interpret the Directive within the meaning of Article 234 of the EC Treaty.

SKAT has confused the issue of beneficial owner and the issue of abuse. On the basis of the case law of the European Court of Justice on abuse, SKAT has concluded that H1 Sarl is a beneficial owner.

<u>No beneficial owner requirement</u>

SKAT's concluding section regarding the parent / subsidiary directive essentially consists of a reference to SKAT's justification that the company cannot invoke the double taxation agreement. The main

ence to SKAT's justification that the company cannot invoke the double taxation agreement. The main reason for refusing H1 Sarl directive protection is therefore that the company is not a beneficial owner.

However, the Parent-Subsidiary Directive does not require the parent company to be a beneficial owner.

As H1 Sarl meets the capital requirement and the ownership time requirement in the Parent / Subsidiary Directive, the company has - as a starting point - an unconditional right to be exempt from withholding tax on the dividend from SA / S.

<u>Abuse regulations - the principle of the right income recipient</u>

As stated in Article 1 (1) 2, the Directive does not preclude the application of internal provisions or conventions which are necessary to prevent fraud and abuse. It follows that abuse can only be counteracted if there is a legal basis for this in domestic law. Cases of abuse can therefore not be counteracted solely by a reference to Article 1 (1). 2.

In Danish law, there are no specific legal provisions on abuse of the directive. On the other hand, the court-created practice of correct income earners and considerations of reality may apply to the extent that this practice can be assumed to remain within the framework of Article 1 (1) of the Directive. 2, as this provision will be interpreted by the Court of Justice.

Jakob Bundgaard and Niels Winther-Sørensen are in SR-SKAT 2007.508 in accordance with this:

"The abuse provision in Article 5 (Article 1 (2) of the Parent-Subsidiary Directive) may lead to the benefits of the Directive being denied, but it is a <u>condition that there is a legal basis for this in internal law</u>. Such an internal legal basis does not necessarily be expressed in a national legal provision, but may also be contained in general internal law principles of abuse.It must also be assumed that Article 5 includes not only actual written abuse rules, but also unwritten circumvention / abuse clauses.In Danish law, the court-created practice about who is the <u>right income</u> recipient , and concrete <u>reality assessments</u>could therefore be used as a basis where such a person can be presumed to remain within the framework of the nature of the Directive. 5, (...) "(emphasis added).

The Danish tax authorities thus have two instruments available against cases of abuse: the principle of the correct income recipient and considerations of reality.

As stated above, H1 Sarl is the correct income recipient of the dividend distributed.

Thus, there is no basis for denying H Sarl exemption from dividend tax.

SKAT points out, inter alia, that there is nothing to prevent companies established in another Member State from invoking EU law when it must be assumed that the establishment of a holding company in another Member State is intended to: to avoid withholding tax on payments to non-European enterprises if such a construction serves no commercial purpose, cf. the European Commission's interpretation of "Purely artificial arrangements" published in OJ 2008, C 116/13.

This stems from a Commission Communication of 10 December 2007 on "The application of measures to combat abuses in direct taxation - in the EU and in relation to third countries".

The Communication sets out the Commission's proposal on how far national anti - abuse rules can go without infringing on the freedoms guaranteed by the Treaty, and this analysis has been carried out on the basis of a number of court rulings, in particular the Cadbury Schweppes judgment. The Commission has concluded on page 3:

"Furthermore, in its case - law on direct taxation, the Court has held that the need to prevent tax evasion or abuse may constitute an overriding reason in the general interest which may justify a restriction on fundamental freedoms. circumvent the application of the law of the Member State concerned ". <u>In order to be lawful, national tax rules must be proportionate and specifically aimed at excluding purely artificial arrangements</u> " (emphasis added).

The whole communication thus presupposes the existence of national rules on the fight against abuse, and the question is what content the Member States can give these rules without violating EU rules.

SKAT seems to presuppose that the notice is based on the case law of the European Court of Justice in itself providing the necessary basis for being able to intervene in cases of abuse. This is not correct. Thus, when SKAT writes, "that the case law of the European Court of Justice is that there is nothing to prevent companies established in another Member State from invoking EU law", it must at least presuppose the existence of a national rule of law with the content in question. SKAT has not referred to

suppose the existence of a national rule of law with the content in question. SKAT has not referred to such a rule.

The quotation included by SKAT from the Commission's communication has been taken out of context in the communication. The full text of the message, p. 9, is as follows:

"The Corporate Tax Directives apply only to companies incorporated in the Member States and their overall purpose is to create conditions within the Community that are equivalent to the conditions of an internal market, by removing tax barriers to cross-border restructuring and to the payment of dividends, interest and It therefore does not appear that their scope includes, for example, the facilitation of arrangements <u>aimed at avoiding withholding tax on payments to non-European enterprises if such a construction does not serve any commercial purpose</u> . it is noted that <u>such avoidance constructions are best prevented by a if not uniform then at least well-coordinated application of measures to combat tax evasion."</u>(Emphasis added).

The first emphasis is the quotation that SKAT has included in the decision. The next emphasis is the Commission's proposal on how to deal with such cases of abuse, namely by introducing "measures" (ie national legal rules) to combat tax evasion.

The conclusion is therefore that Article 1 (1) of the Directive 2 is not an abuse rule that can be applied by the European Court of Justice, but rather an authorization for the Member States to introduce or maintain national abuse rules.

In Denmark, it is the court-created practice of the correct recipient of income and considerations of reality that may come into play, and this does not lead to H1 Sarl being denied tax exemption from the dividend.

There is no basis for referring questions to the Court of Justice for a preliminary ruling because the directive is clear and leaves no doubt as to interpretation. Conversely, it is clear that if the National Tax Tribunal - contrary to the wording of the Directive - refuses to grant H1 Sarl a tax exemption on the dividend, this cannot be done without referring questions to the Court of Justice for a preliminary ruling.

<u>Aggressive change of practice with retroactive effect</u>

In the event that SKAT were to prevail that the underlying owners (the investors in the private equity funds) are subject to limited tax liability on the dividend in question, it is argued that SKAT's decision is an expression of a tightening of practice with retroactive effect, and that such practice tightening cannot legally be implemented without SKAT having previously notified the new views that SKAT will consider crucial for this new practice, cf. UfR 1983.8 H.

As stated above, the present case is the first - and so far only - case in which the tax authorities have refused tax exemption on dividends to a parent company in a DBO country on the grounds that the parent company is not the beneficial owner of the dividends.

This has even happened with such a broad justification that it must be assumed to affect hundreds of dividend distributions made from Danish subsidiaries to intermediate holding companies in DBO countries. Although the present case is the result of a special control effort against Danish groups acquired by private equity funds, the problem is by no means peculiar to private equity funds.

This is also confirmed by the Minister of Taxation in the answer to question 87 to L 213 (2006/07).

Question 87:

Can the Minister confirm that the issue raised in question 75 on the taxation of dividends to flow-through companies not only concerns private equity funds, but is a general problem that has been relevant for a number of years?

Answer: It can be confirmed. "

The Minister of Taxation also has in his answer to question 10 to L 30 (2006/07) on the extent to which and how SKAT controls whether a throughput holding company must be approved as the right income recipient of a dividend received, e.g. stated the following:

"Danish companies that decide or decide to distribute dividends have a duty to provide the tax authorities with information about this, regardless of whether there is a duty to withhold or not.

<u>It is part of the tax assessment to ensure</u> that the conditions for not including dividend tax are met, including whether a foreign company is the rightful owner of the dividend. "(The representative's emphasis).

Nevertheless, the Minister of Taxation has several times had to state that there are no examples of dividend taxation of distributions to flow-through companies, cf. the Minister's answer to question 6

to L 30 (2006/07):

"I can not provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as the rightful owner of dividends from Danish companies."

Although SKAT has thus over the years been fully aware of the issue, SKAT has not previously found reason to refuse exemption from dividend tax. The mentioned ministerial responses - and a number of other ministerial responses - show that there has been a focus on the issue in connection with the intervention of private equity funds in recent years.

It is therefore natural to raise the question of whether the statements of the Minister of Taxation do not contain a warning about a change in practice. First, it should be noted that the statements of the Minister of Taxation are after the time when the dividend distribution was made. In addition, however, the Minister of Taxation in all these answers - in accordance with the prevailing view in theory - has stated that there are "very narrow limits for when Danish tax authorities can override a duly registered and fully taxable foreign company", cf. thus the Minister's answer to questions 86 to L 213 (2006/07):

"However, a flow-through company (holding company) cannot be equated with an agent or an intermediary. Such a company is registered and fully taxable in the country in which it is domiciled and the starting point is clearly that a holding company is entitled to contractual protection.

There are thus very narrow limits for when Danish tax authorities can override a duly registered and fully taxable foreign company and as stated in the answer to question 6 regarding Bill L 30, there are also no examples of Danish tax authorities refusing to recognize a foreign holding company and thus, it was considered null and void. "(emphasis added).

Thus, the companies did not have the slightest reason to believe that a dividend such as that at issue in the main proceedings could be refused tax exemption, and it is clear that H1 Sarl would not have made that distribution if there was the slightest doubt that that the dividend was exempt.

In the light of the foregoing, it is therefore argued that there is a tightening up of a fixed administrative practice which should have been notified and that this changed practice cannot therefore be applied in the present case.

**SKAT's statement**

SKAT has ratified the decision upheld.

There is a limited tax liability to Denmark of the dividend in question pursuant to section 2 (1) of the Danish Corporation Tax Act. 1, letter c, and this taxation must not be waived either pursuant to the double taxation agreement between Denmark and Luxembourg or pursuant to the Parent / Subsidiary Directive.

Withholding tax can be implemented in Denmark regardless of the double taxation agreement with Luxembourg

The double taxation agreement of 17 November 1980 between Denmark and Luxembourg, cf. Executive Order no. 95 of 23 September 1982, stipulates that dividends paid from a company domiciled in Denmark to a recipient domiciled in Luxembourg may not be subject to withholding tax in Denmark, exceeding 5% of the gross amount of the dividend if the recipient is the "rightful owner of the dividend" and directly owns at least 25% of the capital of the company paying the dividend, in accordance with Article 10 (1). Pursuant to the internal Danish rules, withholding tax in Denmark is waived altogether, cf. section 2 (1) of the Danish Corporation Tax Act. 1, letter c.

The starting point is therefore that according to the double taxation agreement, it is not possible to consider dividends paid to a parent company in Luxembourg to be covered by the limited tax liability in accordance with section 2 (1) of the Danish Corporation Tax Act. 1, letter c.

As stated above, however, according to the wording of the double taxation agreement, it is a condition for the cut-off of Denmark's right to tax dividends as a source state that the Luxembourg recipient of the dividend is its "rightful owner".

Therefore, in accordance with the wording of the Corporation Tax Act, section 2, subsection 1, letter c, assesses whether the double taxation agreement cuts withholding tax because the Luxembourg (formal) dividend recipient is also a "rightful owner". According to the wording of the provision, it is therefore not decisive whether another / others under internal Danish law should be considered taxable (e) of the dividend amount, but rather whether the Luxembourg company fulfills the requirements to be a "rightful owner" according to a correct interpretation of this special agreement concept.

The term "beneficial owner" has been used in the OECD Model Convention and its comments since the revision of the Model Convention in 1977. The comments on the term "beneficial owner" have

The revision of the Model Convention in 1977. The comments on the term "beneficial owner" have been gradually clarified, but there is no basis for this. to claim that there have been material changes in relation to what is meant by the term, which is also used by Winther-Sørensen and Bundgaard, SR-SKAT 2007, 5. 400.

In the comments on the Model Convention, the question of the understanding of the term "rightful owner" is now dealt with in particular in paragraphs 12, 12.1 and 12.2 of Article 10.

When the qualified term "rightful owner" / "beneficial owner" is used in the double taxation agreements rather than just "owner" / "owner", this is a clarification that the formal ownership is not decisive in relation to the double taxation agreements.

In line with the above recital, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs, which is directly referred to in point 12.1 of the comments, concludes. in fine that an "intermediary" can not be considered a beneficial owner when it "actually has very narrow powers which, in relation to the income in question, make it a" nullity "or administrator acting on behalf of other parties ". Thus, although the report specifically deals with the cases where there is an actual throughput, there is no basis for claiming that it is the actual throughput that determines whether the Contracting States are obliged to waive withholding tax.

A natural linguistic understanding of the Model Convention and the comments thereon thus imply that emphasis must be placed on the scope of the formal amount recipient's real powers in relation to deciding how to dispose of amounts received.

It is also clear from point 12.1. in the comments to the Model Convention, that the cases where there is pure flow - and where it can thus be demonstrated that the amount is immediately repaid to e.g. the underlying owner - just one example is that the formal beneficiary should not be considered the rightful owner. It is in fact "also" contrary to the purpose and intention behind the rules of the Model Convention to grant relief in these situations.

Thus, when the formal powers of the formal payee to decide how to dispose of amounts received are very narrow - or as non-existent here, cf. below - the right to invoke the double taxation agreement can thus be cut off. This means that an dividend amount that the underlying owner (s) has decided in advance to direct to where they want it, without the intermediate company being given any real opportunity to influence this decision, does not have the intermediate company as "rightful owner".

The same view is expressed by Klaus Vogel in "Klaus Vogel on Double Taxation Conventions", 3rd ed., P. 563, point 10 in fine.

The concept of "rightful owner" is only sparsely addressed in international case law. However, there are three cases from the British Court of Appeal, the French Conseil d'État and the Canadian Federal Court of Appeal, respectively, which deal with the qualification of the "rightful owner".

In the Bank of Scotland case (referred to above), the French Conseil d'État found that the US parent company, which had disposed of the dividend and directed it to the bank to which the loan was to be repaid, was considered the rightful owner.

The Indofoods case (referred to above) was decided by the British Court of Appeal, which ruled on the concept of "beneficial ownership" in paragraph 42:

"the concept of beneficial ownership is incompatible with that of the formal owner who does not have the full privilege to directly benefit from the income."

Subsequently, the British Court of Appeal ruled that the Dutch company could not be considered a "rightful owner" in relation to the interest payments from Indofood. Thus, even though the Dutch company would not be legally obliged to Indofood to repay the interest income, it was thus sufficient that in practice the income was already disposed of in such a way that it would in fact never be subject to the Dutch company's disposal.

The term "beneficial owner" was also addressed in the judgment of the Canadian Federal Court of Appeals of 26 February 2009 in the Prévost case (referred to above). In the judgment, it was apparently given decisive weight that the holding company was not a party to the shareholder agreement

entered into between the two company shareholders and that they could not take legal action ("take action") against the holding company if it did not comply with the dividend policy in the shareholder agreement. The judgment thus seems to assume that the formal beneficiary is the "rightful owner" unless the beneficiary is legally obliged to dispose of in a particular respect. Thus, as in the Indofood case, it was not sufficient that there was no practical probability that the dividend would not be paid further. In SKAT's view, this requirement has no support in the Model Agreement, the comments thereon or elsewhere. On the contrary, the concept of "beneficial owner" is based on a "substance over form thinking" and it is not compatible with this thinking that the definition of the concept re-

quires a legal obligation to repay to the person considered "beneficial owner". .

Regarding the Prévost case, it should also be noted that (paragraphs 8-11 of the judgment under appeal) there were reportedly good reasons for the establishment of the chosen holding company structure, which was to form the basis for permanent activities and was expected to involve activities other than the ownership of the Canadian company, and that the Court of Appeal expressly held that the cash flows in question had not been determined in advance ("predetermined", cf. paragraph 16 of the judgment of the Court of Appeal with reference to paragraph 102 of the judgment under appeal). It seems difficult to point to transactions that can be characterized as such tax evasion, which must be included in the assessment of whether someone other than the formal owner should be considered the rightful owner.

The fact that the dividend had been disposed of in advance means that H1 Sarl could not exercise an owner's powers over the dividend. The formal amount recipient's lack of access to dispose of the dividend must be of decisive importance, regardless of whether the underlying owners have channeled the dividend on to themselves, or whether they have used their access to dispose of the dividend in another way, cf. The Bank of Scotland case mentioned above where the amount was channeled to a bank in a third country.

The Minister of Taxation's comment on L-202 of 22 April 2009 also supports the view that no condition can be set that the amount received has in fact been passed on to the underlying owner (s). The Minister of Taxation had been asked to comment on an example where all the shares in a Danish operating company (DK) were owned by a holding company in Luxembourg (Lux), which in turn was wholly owned by a company in Panama (PA). In the example, the company in Luxembourg received a dividend which was used to repay debt in an external bank. In this connection, the Minister of Taxation noted the following:

It is not possible on the basis of the information in the example to confirm or deny that Lux is considered a "beneficial owner" , instead uses the dividend to repay debt to an external bank. "(SKAT's emphasis).

If the dividend is further channeled to the underlying owners, this will of course be a factor that supports the fact that the immediate dividend-receiving company has had very narrow powers in relation to the dividend. On the other hand, it cannot be set as a condition that the immediate dividend-receiving company is not the "rightful owner".

The company's representative has referred to the ministerial answer printed in <u>SKM2008.728.DEP</u>. In SKAT's view, it is only natural that the Ministry merely states that in the example described, there is no cash flow via the Cayman company at all - neither out of nor into Denmark - which could give rise to considerations as to whether the company is a pure flow-through company. This is because the assessment of whether e.g. the dividend-receiving company is the rightful owner that the dividend is made on the basis of information about the company's real right of disposal over the specific dividend amount and the purpose (tax avoidance?) of the company receiving the amount. Thus, when it is only a hypothetical and not an actual cash flow, it is not possible to judge whether the company on Cayman is a flow-through company. The status of the company will depend on the factual information about the cash flow in question.

The statement in the Ministry's comment can therefore not be taken as income that actual flow to one or more underlying owner (s) is a condition for the formal recipient of dividends not to be considered a "rightful owner" within the meaning of the double taxation agreements.

SKAT claims that the dividend-receiving company, H1 Sarl, has had such narrow powers in relation to the dividend that this company cannot be qualified as a "rightful owner" in relation to this. The underlying owners or their representatives had decided in advance on the implementation of the circular arrangement, and H1 Sarl was obliged to re-lend the distributed dividend to SA / S, which re-lending was also made on the same date as the dividend distribution. Thus, the dividend had already been disposed of in such a way that it was never really subject to the actual disposal of the formal beneficiary.

It is sufficient that the lack of control over the dividend is related to the further channeling of the dividend.

The return of the capital to the dividend-distributing company became final in relation to the convertible loan upon conversion to shares. Overall, H1 Sarl has not been provided with any capital that the company has at any time actually had at its disposal.

The interest on both loans has been continuously credited to the principal.

As stated in the comments on Article 10, point 12.1, the concept of "rightful owner" must be inter-

As stated in the comments on Article 10, point 12.1, the concept of "rightful owner" must be inter-preted in the light of and in accordance with the purpose of double taxation agreements, which in-cludes the consideration of tax evasion and avoidance, see also point 7 in the comments on Article 1.

Thus, in determining whether the Luxembourg dividend recipient, H1 Sarl, is the rightful owner, it will also be relevant whether the disposition had a real business purpose or whether it was intended to exploit benefits provided for in the double taxation agreement.

The arrangement with the distribution and re-lending on the same day did not take place as part of an ordinary commercial transaction, but on the contrary was made without any commercial justification.

This is underlined by the fact that the recipient company was actually obliged to re-channel the amount, that the re - channeling took place on the same day as the dividend was received, that the dividend was not taxed in the recipient state, that the companies involved had no operational activity other than ownership and financing. group companies, and that the companies involved had neither office facilities nor employees', and that the circular arrangement with distribution and simultaneous re-lending was even established even before the establishment of the Luxembourg intermediate holding companies.

The purpose of the arrangement has instead been to utilize the double taxation agreement (and Community law) partly to establish a right of deduction (for interest expenses) without thereby trig-gering withholding tax in Denmark or taxation abroad, partly to avoid payment of capital duty in Luxembourg.

It would therefore be incompatible with the intention and purpose of the double taxation agreement to ease withholding tax in this situation. In this connection, reference may be made to point 9.4 in the comments on Article 1, which states:

"Whichever of the two views is taken, there is agreement that states are not obligated to grant bene-fits under a double taxation treaty by participating in events that involve abuse of the provisions of the treaty."

Thus, under the Danish-Luxembourg double taxation agreement, Denmark is not obliged to refrain from imposing it in section 2 (1) of the Danish Corporation Tax Act. 1, letter c, provided withholding tax on dividends in a situation such as the present.

To the extent that the rightful owner (s) is domiciled in a country with which Denmark has entered into a double taxation agreement, it is recognized in SKAT's decision that it must refrain from imposing withholding tax pursuant to section 2 (1) of the Corporation Tax Act. 1, letter c. It is of course still pos-sible for the company to avoid the withholding tax claim raised by proving that the conditions for not imposing withholding tax are present.

EU law does not preclude the implementation of a withholding tax in Denmark

It follows from Article 5 of the Parent-Subsidiary Directive that the profits which a subsidiary distrib-utes to its parent company are exempt from withholding tax. The starting point is thus that withhold-ing tax cannot be levied on dividend distributions to companies domiciled in another Member State when the parent company meets the capital requirement and the ownership time requirement in the Directive.

However, this starting point may be deviated from. It is thus stated in Article 1 (1) of the Directive. 2, that the Directive does not preclude the application of internal provisions or conventions which are necessary to prevent fraud and abuse. The European Court of Justice has recognized early in its case law that in certain cases Member States have the right to take measures to combat abuses of EU law. In the Van Binsbergen case of 1974 (Case 33/74, Van Binsbergen, Saml. 1974, p. 1299), the Court thus established the so-called Van Binsbergen doctrine, according to which a Member State has the right to:

"take measures to prevent the freedom guaranteed in Article 59 (now 49 EC) from being exploited by a service provider whose activities are wholly or mainly directed at the territory of that State with a view to evading the professional rules which would apply to him if he resided in the territory of that State, since such a situation could be settled under the chapter on the right of establishment and not the chapter on the freedom to provide services ".

The Halifax judgment (Case C-255/02 Halifax [2006] ECR 1-1609) concerned a United Kingdom company which was refused access to deduct input VAT in respect of certain transactions (VAT carousel fraud) which British authorities were implemented solely for the purpose of obtaining a tax

carousel fraud) which British authorities were implemented solely for the purpose of obtaining a tax advantage and which did not have an independent business purpose. In this context, the Court clarified the principle of abuse of law under EU law. see paragraph 69 of the judgment, from which the following appears:

"Thus, the scope of Community law cannot be extended to cover the unlawful transactions of traders, that is to say, transactions which have not taken place in the course of ordinary commercial transactions but which have only had the unlawful purpose of obtaining benefits under Community law (see, inter alia, Judgment of 11.10.1977, Case 125/76 Cremer [1593], paragraph 21; , and Emsland-Stärkedommen, paragraph 51). "

The case concerned the VAT area, but it is clear from the judgment that the principle of prohibition of abuse applies both in the area of taxes and duties, cf. paragraph 70. The doctrine of the Halifax judgment is later repeated in case law, cf. for example paragraph 32 in the judgment of 7 June 2007 in C-178/05, which concerned the Capital Contributions Directive (59/335).

Furthermore, in line with its rulings on circumvention of company law rules, the Court ruled that taxable persons may carry out tax planning by choosing a corporate structure that reduces their tax liability as much as possible. Subsequently, in paragraphs 74 to 75, the Court then set out a "two-step test" which found that VAT had been misused:

"firstly, requires that the transactions in question, even if the conditions formally complied with, laid down in the relevant provisions of the Sixth Directive and in the national legislation implementing the Directive - would entail a tax advantage which: it would be contrary to the purpose of those provisions to grant.

Secondly, it must also be clear from an overall series of objective circumstances that the main purpose of the transactions in question is to obtain a tax advantage. As the Advocate General observes in point 89 of his Opinion, the prohibition of abuse loses its relevance when there may be a justification for the transactions in question other than merely obtaining tax advantages. "(SKAT's underlines)

There are thus two cumulative conditions, an objective (contrary to the purpose of the rule) and a subjective condition (intention to obtain a tax advantage).

The judgment further stated that the assessment of malpractice must be carried out by the national court using national rules of evidence, provided, however, that the national court must not limit the scope and effect of EU law.

The judgment in Cadbury Schweppes (Case C-196/04, Cadbury Schweppes, Coll. 2006, pp. 1-7995) concerned the question of the compatibility of British CFC law with freedom of establishment. In the present case, the legislation was applied in relation to a British parent company which had established subsidiaries in Ireland for the sole purpose of benefiting from the lower level of taxation in Ireland.

The Court initially held, citing the Centros and Inspire Art judgments, that the fact that a company establishes subsidiaries in other Member States for the sole purpose of benefiting from more favorable tax legislation does not in itself constitute an abuse of the freedom of establishment. The Court then found that UK CFC law constituted an obstacle to freedom of establishment. The UK Government justified this obstacle by stating that the legislation was intended to combat a special form of tax evasion in the form of artificial transfer of profits from the resident company to the foreign subsidiary subject to a lower level of taxation. In that regard, the Court stated (paragraphs 50 to 51) that:

"the mere fact that a resident company establishes a secondary establishment, such as a subsidiary, in another Member State cannot form the basis of a general presumption of tax evasion and serve as a justification for a measure; On the other hand, a national measure restricting the freedom of establishment may be justified where it specifically targets purely artificial arrangements the purpose of which is to circumvent the legislation of the Member State concerned. "(SKAT's emphasis)

In its judgment, the Court further held that the assessment of the existence of a "purely artificial arrangement" must include both a subjective factor (the intention to obtain a tax advantage) and an objective factor (the purpose of freedom of establishment).

Furthermore, the Court clarified that the concept of "purely artificial arrangements" includes conduct which is not based on any "economic reality". The Court held (paragraph 67) that the concept of "economic reality" must be defined on the basis of objective factors which can be verified by a third party, including "the degree of physical existence in terms of premises, staff and equipment". On the other hand, the fact that the subsidiary's activities could just as well have been carried out by a domestic company is not a sufficient basis for establishing a purely artificial arrangement (paragraph 69).

The concept of abuse of law in the field of tax law is also illustrated by the judgment in Kofoed (Case

The concept of abuse of law in the field of tax law is also illustrated by the judgment in Kofoed (Case C-321/05, Kofoed, Saml. 2007, p. I-5795).

The case raised (according to the European Court of Justice) the question of whether a completed share exchange was exempt from disposal tax under the Directive. The Court ruled (paragraph 38) that Article 11 of the Directive, which allows Member States to preclude citizens from relying on the Directive when a provision "as the main purpose or as one of the main purposes has tax evasion or avoidance" reflects "the general principle of prohibition in Community law against judicial abuse ".

In that regard, the Court referred to its rulings in the Halifax and Cadbury Schwepp cases, not reiterating the considerations of abuse of law set out in those judgments, but merely finding that the scope of EU law could not be extended to cover "unlawful transactions" has not taken place as part of "ordinary commercial transactions". However, there is hardly any difference in reality in this.

Following the ruling, the Ministry of Taxation responded in the affirmative in the national case. However, this decision must be seen in the light of the fact that the National Tax Court had previously found that the lack of explicit incorporation of Article 11 of the Merger Tax Directive meant that citizens could invoke the Directive's provisions on the right to carry out corporate restructuring tax-free, even when tax evasion / avoidance was a main purpose of the transaction, cf. the National Tax Court's ruling published in TfS 1999, 491. Precisely because this ruling had been published - and its result had already in previous cases been used as binding on the ministry - it was in the specific case the assessment , that there was no basis for a continuation of the national proceedings,

Reference is made to the Communication from the European Commission published in OJ 2008 C 116/13. The Commission's interpretation of the case law of the European Court of Justice is also that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from e.g. the Parent / Subsidiary Directive - when it must be assumed that it is an arrangement aimed at avoiding tax payment and the construction does not serve any commercial purpose.

As explained above, the transactions which give rise to the issue in the present case are precisely characterized by the fact that they serve no commercial purpose, but only intend to obtain tax advantages, including by exploiting the rules of parent / Subsidiary Directive to avoid withholding tax. EU law can thus not to a greater extent than the double taxation agreement be considered to prevent Denmark from implementing a withholding tax on interest and dividends on the grounds that the formal beneficiary - the Luxembourg company - has no powers to dispose of the distributed amount and therefore not the rightful owner.

In this context, it must be emphasized that it is not a precondition for cutting off the right to rely on the Directive that it is demonstrated that the very creation of a Luxembourg holding company is an artificial arrangement without economic reality, as under EU law an assessment of whether specific transactions have such a real commercial content that they - in relation to the exploitation of EU law - must be accepted by the Member States.

SKAT does not consider that it is a condition for non-relaxation pursuant to the Parent / Subsidiary Directive that a specific legal basis has been implemented to enforce Article 1 (1) of the Directive. 2, cf. thus also the Kofoed judgment and the Ministry of Taxation's above-mentioned comment thereon.

Although the Ministry of Taxation chose to respond in the affirmative in the Kofoed case before the Eastern High Court, this was due, as mentioned in the comment, solely to the fact that in relation to the provision in the Merger Tax Directive an order had not been brought before the courts. could not be enforced by the authorities before the introduction of the licensing institution. There is no basis for extending this ruling concerning the previously applicable merger tax rules to apply to the issue of enforcement of the abuse clause in the Parent / Subsidiary Directive.

In addition, in SKAT's view, there is in any case a clear legal basis for enforcing Article 1 (1) of the Directive. 2:

The Corporation Tax Act, section 2, subsection Article 3 (1) (c) provides:

"It is a condition that the taxation of dividends be waived or reduced in accordance with the provisions of Directive 90/435 / EEC on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the State of resident. "

This sentence was inserted by Act No. 282 of 25 April 2001, as the amendment was intended to reintroduce the withholding tax on dividends. In the original bill (L 99 2000 / 0l), the provision was proposed to be worded as follows:

"It is a condition that the parent company is domiciled in a state that is a member of the EU, in a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2 of Directive 90/435 / EEC. "

During the consideration of this proposal, however, the Minister of Taxation tabled an amendment (corresponding to the final wording of the provision), justifying this as follows:

"It is proposed to clarify that it is a condition of the proposed tax exemption that Denmark must waive the taxation of the dividend in question in accordance with the provisions of the Parent / Subsidiary Directive, or that Denmark must waive or reduce the taxation of the dividend in question in accordance with the double taxation agreement with the Faroe Islands. "Greenland or the other State concerned."

Both the wording and the preparatory work thus unequivocally show that withholding tax must be implemented, unless such taxation is contrary to EU law and / or the DBOs.

In any case, a clear legal basis has been provided for SKAT to implement a withholding tax, unless it must be concluded that under the Parent / Subsidiary Directive it is mandatory to waive withholding tax, which is precisely not the case in the provisions of Article 1 (1). 2, mentioned cases.

<u>No sharpening of practice</u>

In the alternative, the company has argued that SKAT's decision is an expression of a tightening of practice with retroactive effect, and that such can not be legally implemented without appropriate notice.

It should be noted that this is a set of rules of a completely new nature, and that one case must therefore be the first.

Next, it is noted that it is the company's responsibility to prove that there is a change in a fixed administrative practice, cf., for example, the Supreme Court's judgments in TfS 2009, 280 and TfS 2000, 148.

It is not an expression of established administrative practice that SKAT has not previously found reason to refuse exemption from dividend tax. A possible (erroneous) lack of tax intervention and correction can not constitute practice and can not create any administrative practice binding on SKAT not to impose withholding tax on dividends.

The Minister of Taxation's answer to question 10 to L 30 (2006/07) states:

"It is part of the tax assessment process to ensure that the conditions for not including dividend tax are met, including whether a foreign company is the rightful owner of the dividend."

If a fixed practice existed, according to which withholding tax was never imposed on dividend distributions, there would be no reason to include in the tax assessment process whether to ensure that a foreign company is the rightful owner of the dividends. Incidentally, there is no evidence to regard the ministerial response as a warning of a change in practice.

SKAT thus disputes that there should be a practice of not imposing withholding tax on dividends to parent companies in EU Member States and / or DBO countries when the parent company is not the "rightful owner" of the dividend.

**The company's comments on SKAT's statement**

Regarding the statement by SKAT that the word "likewise" in section 12.1 of the comments should show that the cases where there is throughput are just one example (among many) that the formal beneficiary should not be considered the rightful owner, it is noted that it is clear from the context that point 12.1 lists 3 situations where a recipient of dividends is not a "rightful owner", namely if he is (1) agent, (2) intermediary or (3) conduit for another person who actually receives that income. In the latter situation, the throughput unit is further required to have "very narrow powers which, in relation to the income in question, make it a" nullity "or administrator acting on behalf of other parties".

Regarding SKAT's reference to the Minister of Taxation's comment on L 202 of 22 April 2009, in which the Minister of Taxation states, "that it does not preclude that PA (the ultimate parent company, inserted here) is considered a" beneficial owner ", that LUX (the intermediate holding company, inserted here) does not actually distribute the dividend, but instead uses the dividend to repay debt to an external bank ", it is noted that the company's representative does not agree with this opinion. The dividend-receiving company has also in this situation disposed for the benefit of itself. Incidentally, the Minister's statement was published at a time when SKAT had decided to pursue the present case and a number of other similar cases, and the statement therefore has the character of a party

submission.

The statement is in stark contrast to the Minister's reply in <u>SKM2008.728.DEP</u> , where the Minister had "difficulty in seeing how in the mentioned example it can be demonstrated that the Cayman Island company is a flow-through company that (...) does not actually carry a cash flow through the Cayman Island Company ".

SKAT has also referred to the Bank of Scotland case, the Indofood case and the Prévost case. However, there is also no support for SKAT in these judgments.

First, all three judgments are about situations where there is actual throughput to the underlying owners. (In the Bank of Scotland case, this happened with the payment of the sale price / loan to the US parent company).

Second, in all three cases, there was treaty shopping. The underlying owners had thus directed the dividends or interest through an intermediate company in order to obtain a collective agreement that would otherwise not be achievable.

With regard to the Prévost case, SKAT has assumed that the decision deviates fundamentally from the present case because the Prévost case did not involve pre-determined dispositions. SKAT has over-looked here that an agreement had been made between the underlying owners (in the shareholders' agreement) on the distribution of 80% of the profit.

In a situation <u>where</u> there has actually been a flow of dividends to the ultimate owners, <u>where</u> the ul-timate owners have decided in advance that dividends are to be distributed through the companies, and <u>where the</u> intermediate holding company has no other activity and physical framework than Thus, in the Prévost case, the Canadian Federal Court of Appeal has not found support for the fact that the Dutch intermediate holding company in question should not be the "beneficial owner" of divi-dends from the Canadian subsidiary.

An assessment of the present case - where there has been no actual throughput, but where the divi-dend has on the contrary benefited the dividend recipient, and where there is no treaty shopping - leads all the more to the same result, namely that there is no basis for not considering the formal re-cipient of the dividend as its "rightful owner".

SKAT has stated that H1 Sarl was obliged to re-lend the distributed amount to SA / S, and that H1 Sarl thus had such narrow powers in relation to the dividend that the company cannot be qualified as a rightful owner in relation to this.

It should be noted that the fact that these dispositions - like any other major disposition in a group - were planned by the management of H1 Sarl before they were implemented does not mean that the company's management could not have disposed differently and it is disputed , that the re-lending to the dividend-distributing company was in no way a decision in which the company's management was involved.

H1 Sarl disposed of the amount distributed by lending this to SA / S, and H1 Sarl has thus had the full benefit of the amount distributed.

With regard to the Parent-Subsidiary Directive, SKAT has referred to "the general principle of Community law prohibiting misuse of rights".

It should be noted that there is no artificial arrangement whose purpose is to circumvent EU law. Thus, the underlying owners have not established H1 Sarl for the purpose of obtaining unintended benefits under the Parent-Subsidiary Directive, and the tax advantage arising from the two countries' different tax treatment of convertible loans is in any case the result of different national tax law, which has nothing to do with EU law. The measures taken are precisely not intended to avoid withholding tax on payments to non-European companies through abuse of the Parent-Subsidiary Directive. Firstly, there has been no redistribution to non-European companies, and secondly, there is no ques-tion of treaty shopping.


SKAT has further argued that the general abuse rules of EU law can apply, regardless of the fact that no legal basis for this has been provided in Danish law.

With regard to SKAT's reference to the Kofoed judgment (Case C-321105, Kofoed), it should be noted that the judgment expressly states that the application of general abusive provisions in Community directives presupposes that such abusive provisions have a legal basis in national law. Reference is made to paragraphs 37-48 of the judgment - below.

46. <u>In the main proceedings, as the Advocate General observes in point 63 of his Opinion, it is for the</u>

national court to determine whether there is a general provision or principle in Danish law. on tax evasion or avoidance, which may be interpreted in accordance with Article 11 (1) (a) of Directive 90/434, thereby justifying the taxation of the exchange of shares in question (…)

47. In such a case, it is for the national court to determine whether the conditions for the application of those national provisions are satisfied in the main proceedings.

48. In the light of the foregoing, the answer to the question referred must be that, in circumstances such as those at issue in the main proceedings, a dividend such as that paid must not be included in the calculation of the "cash compensatory amount" referred to in Article 2 (d) of Directive 90/434, and an exchange of shares such as that at issue in the main proceedings therefore constitutes an "exchange of shares" within the meaning of Article 2 (d) of that directive.

Consequently, Article 8 (1) Article 11 (1) of Directive 90/434 precludes, in principle, the taxation of such an exchange of shares, unless national legislation on misuse, tax evasion or avoidance can be interpreted in accordance with Article 11 (1) of that directive. (A) and thus justify the taxation of the exchange. "(Emphasis added).

The European Court of Justice has expressly stated that only internal Danish legislation on misuse of taxes, tax evasion or tax avoidance can justify a departure from the directive's tax exemption provisions. These legal provisions do not have to consist of legislation, but can also be unwritten legal principles.

The result is further supported by the fact that Article 1 (1) of the Parent-Subsidiary Directive 2 - contrary to Article 11 (2) of the Merger Tax Directive 1, letter a - directly refers to "internal provisions" on fraud and abuse.

SKAT has also referred to the Ministry of Taxation's comment on the Kofoed judgment in SKM2007.843.DEP (TfS 2008, 45), in which the Ministry has explained why the Ministry subsequently responded in the affirmative in the national case. However, it does not rely on the outcome of the national case, but on the judgment of the European Court of Justice, according to which the application of abuse rules requires a legal basis in national law.

The conclusion is therefore that Article 1 (1) of the Parent-Subsidiary Directive 2 is not a substantive abuse rule, but rather an authorization for Member States to introduce or maintain national abuse rules. In Denmark, it is the court-created practice of the correct income recipient and considerations of reality that may come into play, and it is undisputed that this practice does not lead to H1 Sarl being denied tax exemption from the dividend.

To the statement by SKAT that there is in any case authority to enforce Article 1 (1) of the Directive. 2, in the Corporation Tax Act § 2, para. 1, letter c, 3rd sentence, it is noted that neither the mere reference to the parent / subsidiary directive in the Corporation Tax Act § 2, para. 1, letter c, 3rd sentence, or the motive remarks provide any support for such a position. The reference to the Parent / Subsidiary Directive simply means that SKAT can apply internal abuse rules. SKAT's line of argumentation is circular because SKAT presupposes the result for which SKAT argues.

Reference is made to the Opinion of the Advocate General in the proceedings before the Court of Justice, C-352/08 (Zwijnenburg BV) - in particular p. 38, 47, 59, 62 and 69. The Advocate General stated, first, that Article 11 of Directive 90/434 / EEC provides exhaustively for the conditions under which it is possible to refuse to apply the tax advantages provided for in that directive and that: presupposes national law, and that the provision's reference to "tax evasion" applies only to the evasion of taxes covered by the benefits of that Directive.

SKAT has denied that there is a tightening of practice.

In this connection, it is noted that the provision in the Corporation Tax Act, section 2, subsection 1, letter c, on limited tax liability of dividends was thus introduced by Act No. 370 of 13 November 1968, which entered into force on 1 January 1970 (in connection with the introduction of the withholding tax). Denmark has thus had rules on foreign companies' limited tax liability to Denmark on dividends for 40 years - only interrupted by a short period of 2 1/2 years from 1999 - 2001.

Law No 1026 of 23 December 1998 thus abolished the general limited tax liability on dividends in parent / subsidiary relationships (25% ownership) with effect from the income year 1999, and reintroduced it in Law No 282 of 25 April 2001 ( in cases where the taxation of the dividend is not to be waived or reduced in accordance with the provisions of the Parent / Subsidiary Directive or in accordance with a double taxation agreement). The latter change in law had effect on dividends paid from 1 July 2001.

The Parent / Subsidiary Directive was implemented in Danish law by Act no. 219 of 1 April 1992 in section 2 (1) of the Corporation Tax Act 5, so that dividend tax would no longer be included in the

section 2 (1) of the Corporation Tax Act. 5, so that dividend tax would no longer be included in the distribution of dividends to parent companies within the EU.

It follows that for almost 20 years it has had a direct bearing on the question of limited tax liability, whether it is a dividend-receiving parent company (within the EU), and since 2001, whether it is a dividend-receiving parent company in a contracting country.

In addition, however, the interpretation that the concept of "rightful owner" over the years has had significance in relation to all the double taxation agreements where this concept is included as a condition for obtaining relief. The concept of "rightful owner" was introduced in the 1977 model agreement.

It is not credible that the fact that (only a large number) cases of limited tax liability have been raised only now, in which the facts are quite similar to the facts in previous income years, should be an indication that the previous tax assessment has been deficient.

It is argued that SKAT's interpretation of what is meant by "rightful owner" has changed, just as SKAT has changed its perception of when a foreign company is entitled to tax exemption under the Parent / Subsidiary Directive.

As an example of this, it can be mentioned that SKAT's now defended interpretation differs from the Minister of Taxation's answer of 6 November 2006 to question S 474, according to which the term "rightful income recipient" must be regarded as very similar to the term "beneficial owner".

As another example, it can be mentioned that SKAT neglects the Minister's response in <u>SKM2008.728.DEP</u> , according to which actual throughput is required.

<u>Freedoms of the EC Treaty</u>

Just for the sake of all cases, it should be noted that the taxation of dividends also entails a violation of the freedoms of the EC Treaty, because the taxation involved involves the application of a more extensive abuse rule to a holding company in another Member State than the abuse rules that can be applied to Danish holding companies.

SKAT's (justified) failure to apply internal abuse rules - considerations of reality and the principle of the correct income recipient - in the case thus shows that SKAT (correctly) would not have imposed dividend tax if H1 Sarl had instead been a Danish holding company. Thus, it would have been more advantageous to establish a Danish holding company than a Luxembourg holding company. Thus, there is an obvious restriction which cannot be justified by overriding reasons in the public interest.

**The National Tax Court's remarks and reasoning**

SA / S has distributed dividends to the parent company, H1 Sarl On the same day, almost the entire amount distributed was lent back to SA / S, which also made an increase in the share capital in DA / S on the same day by paying x DKK. DA / S has used the amount to purchase AA / S. At the end of the year, the convertible loan to SA / S incl. interest converted to share capital in SA / S.

According to the withholding tax act, section 65, subsection 1, companies must include dividend tax in connection with the adoption or decision on the payment of dividends. According to the provision's paragraph. 5, however, no dividend tax shall be included in dividends that a company domiciled abroad receives from a company domiciled in this country when the dividend in question is not covered by the tax liability, cf. . 1, letter c.

According to the current Corporation Tax Act, section 2, subsection 1, letter c, companies domiciled abroad are, as a rule, subject to limited tax liability on dividends, cf. However, this does not apply to dividends received by a company that owns at least 20% of the share capital in the dividend-giving company for a continuous period of at least 1 year, within which period the dividend distribution date must be, cf. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435 / EEC on a common taxation system for parent companies and subsidiaries of different Member States or under a double taxation agreement with the State of residence, cf. pkt.

<u>3 members of the court - including the presiding judge - note:</u>

According to the double taxation agreement between Denmark and Luxembourg of 17 November 1980, Article 10, para. 2, dividends may be taxed in the source State. However, if the recipient is the legal owner of the dividend and is a company that directly owns at least 25% of the capital of the distributing company, the tax imposed may not exceed 5% of the gross amount of the dividend.

The provision corresponds to Article 10 of the OECD Model Convention.

The commentary to Article 10 point 12 of the Model Agreement states, among other things, that the

The commentary to Article 10 point 12 of the Model Agreement states, among other things, that the term rightful owner is not used in a narrow technical sense, but must be seen in the context and in the light of the agreement's intent and purpose, including avoiding double taxation and preventing tax evasion and avoidance. Section 12.1 of the commentary states that an agent or intermediary cannot be considered a rightful owner and that a person acting otherwise than as an agent or intermediary merely acts as a "conduit" for another person who is in fact receives the income in question, can also not be considered the rightful owner. Reference is made to the report of the Committee on Fiscal Affairs, which states that a "flow-through company" cannot normally be considered the rightful owner if it, although it is the formal owner, it actually has very narrow powers, which, in relation to the in-come in question, makes it a "nullity" or administrator acting on behalf of other parties. Paragraph 22 of the commentary recommends agreeing on special exceptions in the event that the beneficial owner of dividends from the source State is a company of the other Contracting State owned by shareholders domiciled outside that State and where the company does not pay out profits in the form of dividends and enjoys a favorable tax treatment.

As a result, dividend recipients who are agents, intermediaries and "flow-through companies" are not considered the rightful owners of the dividends. In the case of "flow-through companies", however, it is a condition that the company has very narrow powers which, in relation to the dividend, make it a "nullity" or administrator. The fact that a recipient of dividends has very narrow powers in relation to the dividend cannot in itself mean that it is not the rightful owner.

As stated above, it is assumed that H1 Sarl received the dividend in question.

As H1 Sarl has not re-channeled the dividend in question to its parent company, H Sarl or its share-holders, but has instead used the dividend for lending to the company, from which it has been used for a capital increase in DA / S, which has finally used the amount to buy AA / S, H1 Sarl can not in re-lation to this dividend be considered a "flow-through company". In those circumstances, H1 Sarl is deemed to be the beneficial owner of the dividend.

As a result, the restriction in Article 10 (1) of the Double Taxation Convention applies. 2, according to which Denmark as a source country can only tax 5% of the dividend.

As the taxation of the dividend must thereafter be reduced in accordance with the double taxation agreement, it follows from section 2 (1) of the Danish Corporation Tax Act. 1, letter c, that the divi-dend is not covered by the limited tax liability.

Under Article 90 of Directive 90/435 / EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, dividends which a subsidiary dis-tributes to its parent company are exempt from withholding tax.

Article 1 (1) of the Directive Paragraph 2 states: "This Directive shall not preclude the application of any internal provisions or conventions which are necessary to prevent fraud and abuse."

It follows that the benefits of the Directive may be denied on the basis of the provisions of national law on the prevention of fraud and abuse. There are no legal provisions in Danish law for this pur-pose, but legal authority to prevent fraud and abuse follows from case law.

As H1 Sarl is considered to be the rightful recipient of the dividend, and since, on the basis of reality, the transactions made cannot be infringed, it is not considered in Danish law to be a legal basis for denying the companies the benefits that follow from the directive. Reference can be made, inter alia, to the judgments of the Supreme Court of 30 October 2003 and 7 December 2006 published in SKM2003.482.HR and SKM2006.749.HR , respectively, as well as to the judgment of the European Court of Justice in case C-321/05 (Hans Markus Kofoed) and the Ministry of Taxation's comment published in SKM2007.843.DEP .

Consequently, pursuant to Article 5 of the Directive, dividends must be exempt from withholding tax.

As the taxation of the dividend hereafter must also be waived in accordance with Directive 90/435 / EEC, it follows - also for this reason - section 2, subsection 1 of the Corporation Tax Act. 1, letter c, that the dividend is not covered by the limited tax liability.

These members of the court find that SA / S has hereafter not been obliged to withhold dividend tax on the dividend, cf. the withholding tax act, section 65, subsection. 5.

A lawyer notes:

As far as the double taxation agreement is concerned, the comments on the Model Convention must be understood as meaning that it is not in itself decisive that the dividend amounts have not been im-mediately transferred to the underlying owners, as the decisive factor is the formal recipient's lack of power to dispose of the dividend. H1 Sarl is not considered a beneficial owner, as the company has

no independent right to dispose of the dividend amounts. As H1 Sarl is thus only deposited as an intermediate holding company, which in fact has no authority to dispose of these amounts in any other way than the underlying ownership structure has decided in advance, the Danish / Luxembourg DBO is not considered to prevent Denmark from implementing a source country tax. of the dividend amounts.

As far as the Directive is concerned, it is not considered a condition for failure to facilitate under the Parent-Subsidiary Directive that a specific legal basis has been implemented nationally to enforce Article 1 (1) of the Directive. 2. It must be assumed that this is an arrangement whose main purpose is to avoid paying taxes and the construction does not serve any commercial purpose, the construction is considered to be infringed in accordance with the general principles of EU law that EU law does not may be invoked for the purpose of committing fraud or abuse.

This court member then finds that SA / S should have included dividend tax on the dividend, cf. the withholding tax act, section 65, subsection. 5.

A decision is made by a majority of votes, and SKAT's decision is amended accordingly.